## U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI

## SOUTHEASTERN DIVISION

| | |
|---|---|
| **DR. SHAMIK BHATTACHARYA, PHD**<br><br>               Plaintiffs,<br><br>   v.<br><br>The Board of Regents of Southeast Missouri State University – **PRESIDENT EDWARD P. GARGAS, VICE PRESIDENT TINA L. KLOCKE, MEMBER DAVID C. MARTIN, MEMBER LLOYD F. SMITH, MEMBER JAMES P. LIMBAUGH**, and **MEMBER VIVEK MALIK** – all individually and all in their official capacities; DR. **CARLOS VARGAS, PHD**, President of Southeastern Missouri State University; **Dr. MIKE GODARD, PHD**, Provost of Southeast Missouri State University; **DR. TAMELA RANDOLPH, PHD**, Dean of the College of Science, Technology, Engineering and Mathematics at Southeastern Missouri State University; **DR. BRADLEY DEKEN, PHD**, Chairperson for the Department of Engineering and Technology at Southeastern Missouri State University; **ALISSA DAVIS**, Director of Human Resources at Southeastern Missouri State University.<br><br>         Defendants. | Case No.: 1:22-cv-00043<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>Date Action filed:  April 4, 2022 |

## <u>COMPLAINT</u>

COMES NOW Dr. Shamik Bhattacharya PhD by and through his undersigned attorneys, and for his Complaint, states as follows:

### INTRODUCTION

1. Plaintiff Dr. Shamik Bhacharya PhD ("Dr. Bhattacharya") was a tenured professor of mechanical engineering on the faculty at Southeastern Missouri University ("SEMO"), a Missouri state institution of higher education within the meaning of Mo. Rev. Stat. § 174.020 *et seq.*

2. Despite SEMO's express representation to Dr. Bhattacharya – and by implication every SEMO tenured faculty member – that "[n]o faculty members, whether tenured or not, shall have their employment terminated in violation of the principles of academic freedom and tenure," SEMO fired Dr. Bhattacharya for telling a student the truth about SEMO's degree program. See Faculty Handbook of Southeast Missouri at p. 86.

3. After years of stagnation in revenue growth, SEMO beginning in 2017 changed their departmental organization aimed at treating the university more like a business. Not enough students were graduating with engineering degrees, and SEMO wanted to implement a more aggressive marketing strategy to boost enrollment.

4. So, SEMO assigned faculty in its mechanical engineering (called "Engineering Physics: Mechanical Applications") department to teach classes in their technology curriculum and call it "engineering."

5. The so called "engineering technology" program was advertised by SEMO as "preparing [students] for industrial careers such as engineering . . ."[1] But that statement is untrue.[2]

---

[1] *Programs: Semo*, SOUTHEAST MO. ST. U.,
https://semo.edu/academics/programs/index.html#engineeringtechnology_undergraduate_sciencetechnologyengineeringmathematics_1 (last visited Mar. 29, 2022).
[2] "For purposes of evaluating engineering curricula at the baccalaureate level, the programs accredited by the Engineering Accreditation Commission (EAC) of ABET shall be the basis used for evaluation of programs not accredited by EAC of ABET." Mo. Code Regs. tit. 20 § 2030-5.080. "A degree in engineering technology does not meet the educational requirements for licensure as a professional engineer." Mo. Code Regs. tit. 20 § 2030-5.080.

6. When Dr. Bhattacharya told a student in engineering technology that the course work was a "diluted form" of engineering that would <u>not</u> prepare them to become professional engineers, the Defendants in concert acted ruthlessly to crush his dissent. SEMO fired him to send a message to other SEMO Professors: If you question SEMO's attempt at to establish an orthodoxy about the departmental realignment, you cannot work here.

7. SEMO's conduct in punishing Dr. Bhattacharya for his dissent is anathema to our system of constitutional governance. Perhaps worse, it is a base attempt to protect SEMO's profits by deluding students into believing their degree is more valuable than it actually is.

### JURISDICTION AND VENUE

8. This is a civil rights action that raises federal questions under the United States Constitution, including the First and Fourteenth Amendments and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9. This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over state claims under 28 U.S.C. § 1367.

10. This Court can award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§2201-02; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

11. Venue is proper in this District and this Division under 28 U.S.C. § 1391(b) because Defendants reside in this district and because all the acts described in this Complaint occurred in this District and this Division.

### PARTIES

12. Plaintiff Dr. Shamik Bhattacharya is a resident of Missouri and a tenured professor of Engineering Physics, an ABET accredited engineering program at Southeastern Missouri State University.

13. Dr. Bhattacharya is a permanent resident under §203(b)(1)(B) of the Immigration Act of 1990, which provides for an expedited immigration procedure for an "outstanding professor or researcher." See 8 U.S.C. § 1153(b)(1)(B). Dr. Bhattacharya was awarded tenure only after a meticulous examination of his accomplishments to ensure that he met a rigorous set of criteria. See Exhibit A, Tenure Letter.

14. Defendants Edward P. Gargas, Tina L. Klocke, David C. Martin, Lloyd F. Smith, James P. Limbaugh, and Vivek Malik (collectively, the "Board Defendants"), are and were at all times relevant to this Complaint, members of the Southeast Missouri State University ("SEMO"), a public university organized and existing under Missouri law.

15. The Board Defendants are responsible for the adoption of regulations, rules and policies necessary for the operation of SEMO, enacted through the By-Laws of Board of Regents of Southeast Missouri State University ("By-Laws"). A true, accurate and complete copy of the By-Laws of Board of Regents of Southeast Missouri State University is attached to this Complaint as Exhibit B.

16. The Board Defendants are granted "full power and authority to adopt all needful rules . . . to appoint and dismiss all officers and teachers; to direct the course of instruction . . . and to have the entire management of the college . . ." under their control. Mo. Rev. Stat. § 174.120.[3]

---

[3] § 174.120 states in full the following: "College under general control and management of regents. — Each state teachers college shall be under the general control and management of its board of regents, and the board shall possess full power and authority to adopt all needful rules and regulations for the guidance and supervision of the conduct of all students while enrolled as such; to enforce obedience to the rules; to invest the faculty with the power

17. The Board Defendants are granted the authority to sue and be sued. Mo. Rev. Stat. § 174.040; Ex. B at 2, Section 1.3.1 (Specifically Enumerated Powers List).[4]

18. The Board Defendants are granted the authority to adopt By-Laws, rules, and regulations for the governance of its members, officers, agents, and employees and require adherence to such rules. Ex. B at 3, Section 1.3.2.

19. The Board Defendants establish, review, and approve new academic programs or changes to existing ones at SEMO. Ex. B at 3, Section 1.3.3.

20. The Board Defendants select the President of SEMO, who serves at the pleasure of the Board. Ex. B at 2, Section 1.3.

21. The Board Defendants serve actively as advocates for the University "in appropriate matters of public policy in consultation with the President of the University and other responsible parties, as the Board shall determine." Ex. B at 4, Section 1.3.11.

22. The Board Defendants approve the grant of tenure based on the recommendation of the University President. Ex. B at 4, Section 1.3.16.

23. Defendant Dr. Carlos Vargas, PhD ("Defendant Vargas") is, and at all relevant times was, the President of SEMO.

---

to suspend, or expel any student for disobedience to the rules, or for any contumacy, insubordination, dishonesty, drunkenness or immoral conduct; to appoint and dismiss all officers and teachers; to direct the course of instruction; to designate the textbooks to be used; to direct what reports shall be made; to appoint a treasurer for such college, and to determine the amount of his bond, which shall be in amount not less than ten thousand dollars; and to have the entire management of the college, including qualifications for admission."

[4] The Board of Regents By-Laws includes two numbered lists under Section 1.3. The first is for powers specifically enumerated under Mo. Rev. Stat. 174.010 *et seq.*; the latter for other powers. Citations are to "other powers" list unless otherwise stated.

24. Defendant Vargas as university president serves as the "Chief Executive Officer"[5] of the University and is responsible for the operation and administration of the University. Ex. B at 9-10. Section 3.7.

25. The Board Defendants delegates to University President Defendant Vargas the power to "exercise a general superintendence and control, subject to approval of the Board, over all affairs of the University." Ex. B at 10, Section 3.7(a).

26. Defendant Vargas is further delegated the authority to make all academic appointments, reappointments, rank, promotions, terminations, and discipline of all employees subject to the grievance and appeal procedures of the University. Ex. B at 11, Section 3.7(e).

27. Defendant Vargas makes recommendation to the Board of all grants of tenure. Ex. B at 11, Section 3.7(f).

28. Defendant Vargas is delegated the authority to ensure compliance with the standards of regional accreditation. Ex. B at 11, Section 3.7(g).

29. Defendant Vargas is further authorized by the Board Defendants to "perform all other acts not herein enumerated which are necessary and reasonable appertaining the administrative functions of University President." Ex. B at 13, Section 3.7(u).

30. Pursuant to his authority as described in the By-Laws, Defendant Vargas delegates to various divisions primary responsibility for *inter alia* academic services, administrative services, and faculty responsibility. Ex. B at 10-13, Section 3.7(a), (b), (i), (s), and (u). Defendant Vargas and his appointees promulgate among other rules and regulations those contained within the Faculty Handbook of Southeast Missouri State University

---

[5] Upon information and belief, SEMO and the Board Defendants adopted language explicitly commercializing the role of University President as CEO as part of their strategy to prioritize profit over education, as described below.

("Handbook"). A true and correct copy of the Faculty Handbook of Southeast Missouri is attached to this Complaint as Exhibit C.

31. Defendant Michael Goddard, PhD ("Defendant Goddard") is and at all times relevant to this case was the provost at SEMO. Defendant Goddard as provost is the chief academic officer of the University and the President's first delegate, with primary responsibility for the overall administration of the academic programs of the University. Ex. C at 10-11, "Roles and Responsibilities."

32. Defendant Goddard oversees all of the University's academic programs, including the College of Science, Technology, Engineering and Mathematics as well as the Department of Engineering and Technology.

33. Defendant Dr. Tamela Randolph, PhD ("Defendant Randolph") is and at all times relevant to this Complaint was the Dean of the College of Science, Technology, Engineering and Mathematics at SEMO.

34. Defendant Randolph was appointed to her position by Defendant Goddard, who bears responsibility for the appointment of deans responsible for overall research of specific academic programs. Ex. C at 18.

35. Defendant Dr. Bradley Deken, PhD ("Defendant Deken") is and at all times relevant to this Complaint was the Department Chairperson for the Department of Engineering and Technology at SEMO.

36. Defendant Alissa Davis is the Director of Human Resources at SEMO, responsible for executing decisions to terminate employees.

37. The Board Defendants and Defendants Vargas, Goddard, Randolph, and Deken are and were aware of the retaliatory and unconstitutional actions taken against Dr. Bhattacharya

and did not instruct University personnel, including the other Defendants, to change or reverse those actions to comply with constitutional mandates.

38. The Board Defendants and Defendants Vargas, Goddard, Randolph, and Deken, independently and in consultation with each other, are responsible for the retaliatory and unconstitutional actions taken against Dr. Bhattacharya.

39. The Board Defendants and Defendants Vargas, Goddard, Randolph, and Deken, independently and in consultation with each other, participated in the retaliatory and unconstitutional firing of Dr. Bhattacharya challenged here.

40. The Board Defendants and Defendants Vargas, Goddard, Randolph, and Deken, independently and in consultation with each other, are responsible for discriminating and retaliating against Dr. Bhattacharya because Dr. Bhattacharya engaged in protected speech and because of Dr. Bhattacharya's viewpoint.

41. Each and every Defendant is sued in his or her individual and official capacities.

## FACTS

**I.    Plaintiff Bhattacharya is hired pursuant to a lawful and enforceable employment contract in 2017.**

42. Around April of 2017, Dr. Bhattacharya applied to SEMO to be professor in their Department of Physics and Engineering.

43. On April 17, 2017, Dr. Bhattacharya received correspondence from SEMO extending an offer of employment to Dr. Bhattacharya as an Assistant Professor, tenure track, which Dr. Bhattacharya signed and returned ("April 2017 Contract").[6] A true and correct copy of the April 2017 Contract is attached to this Complaint as Exhibit D.

---

[6] As described below, Defendants Vargas, Godard, Randolph, Deken and Davis admit that the April 2017 Contract was a legally binding employment contract.

44. The April 2017 Contract indicates that the "appointment may be terminated by the University according to the terms and conditions of the tenure policies found in the faculty handbook."

45. At the time of his hire, Dr. Bhattacharya brought with him around $35,000 worth of equipment to be used towards his research on heart valves. This included the cell scale uniaxial substrate stretching, which stretched tissue on a single axis. *See* Bhattacharya evaluation, Spring 2018.

46. Throughout the application process, Dr. Bhattacharya emphasized the repeatedly his desire to foster the development of his student's mechanical engineering knowledge through applied research.

47. Dr. Bhattacharya made clear that he would not accept a position at SEMO unless he was provided sufficient space and equipment with which to conduct his own research.

48. During the interview process, SEMO expressly reciprocated Dr. Bhattacharya's interest, crediting in his contract for the value of the equipment he brought with him because of its value to his continued research there.

49. SEMO further knew at the time and was expressly told of the importance of having a cryofreezer, digital image correlation equipment, vivitrol flow loop, and a biaxial tissue stretching device.

50. Dr. Bhattacharya was explicitly promised throughout the negotiation leading to the April 2017 Contract that both conditions described in ¶ 45-46 would be met.

51. Dr. Bhattacharya was offered the April 2017 Contract consistent with SEMO's national search processes through the procedures described in the Faculty Search Process

Guidelines. A true and correct copy of SEMO's Faculty Search Process Guidelines is attached to this Complaint as Exhibit F.

52. Dr. Bhattacharya was hired to perform research and to assist mechanical engineering students in performing research. Upon information and belief, his research ability or other related factors were included on the approved evaluation grid and scoring criterion and evaluated as part of his Candidate Materials. Ex. F at 1 ¶ 6 and 2 ¶ 14.

53.  Dr. Bhattacharya was hired in part on the basis of the economic and social value of his research. The Search Committee Chair, Department Chair, Human Resources Manager, Provost and Dean at the time all reviewed his research and capacity to perform future research and extended the offer to Dr. Bhattacharya on the basis of that research. Ex. F. 3, ¶ 25-28.

54. Dr. Bhattacharaya negotiated the terms of the April 2017 Contract to emphasize the importance of research in part when discussing moving expenses.

55. In the context of the negotiation, Dr. Bhattacharya was explicitly and emphatically promised that every time his contract would be renewed, he would be given an additional $15,000 in research funds. Performing the research without adequate lab space and equipment would be impossible.

56. The April 2017 Contract indicates in commemoration of this promise that "[y]ou *will be allocated* $15,000 in start-up funds to support professional development opportunities, provided by the College of Science, Technology and Agriculture and the department of Physics and Engineering Physics." Ex. D at 3 (Emphasis Supplied).

57. Dr. Bhattacharya's April 2017 Contract provides:

> The appointment is probationary. An evaluation of
> your performance will be made each semester for the

first three years and annually thereafter. In each year of the probationary period, contingent on a successful performance evaluation and programmatic need, your contract will be *continued for* the following year.

Ex. D at 1, "Tenure and Promotion" Section. Emphasis Supplied.

## II.   SEMO Breaks Dr. Bhattacharya's Contract in Two Different Ways During His First Year.

### a.   Failure to pay $15,000 research grant upon renewal of contract

58. "Continued" is given two similar but distinct meanings by Merriam-Webster dictionary: 1. Lasting without interruption; and, 2. Resumed after interruption.[7]

59. The parties understand at the time was that this promise to "continue" funding meant that SEMO promise to grant Dr. Bhattacharya $15,000 every time his contract was renewed. The renewal process interrupted the contract; when it was resumed, the obligation to pay again was also.

60. The Faculty Handbook indicates that "[t]he probationary faculty member is to be evaluated each semester for the first two years and once each year for the remaining years of the probationary period." Ex. C at 102.

61. On this basis, Dr. Bhattacharya's expectation of the continued renewal of SEMO's obligation to make the $15,000.00 payment

---

[7] *Continued*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/continued (last visited Mar. 24, 2022).

after the interruption caused by the periodic evaluation is the clearest understanding of the April 2017 Contract.

62. Despite being the only reasonable interpretation of the April 2017 Contract, SEMO refused to honor the provision. In fact, during the first periodic renewal period lasting until around February of 2018, SEMO paid only $5,000, and that as a separate grant from GRFC. The same is confirmed in the First Annual Merit Review he received. *See* Exhibit G, a true and correct copy of the First Annual Merit Review ("First Annual Merit Review").

63. Dr. Bhattacharya performed his portion of the contract, performing research with five undergraduate students and submitting an abstract with two of them to present at the Biomedical Engineering Society Conference in Atlanta.

64. But Dr. Bhattacharya never received the equipment needed to perform the research he was hired to perform.

**b.  Failure to honor promise regarding research space**

65. As soon as Dr. Bhattacharya arrived on campus, he was brought to the room where his office would be located.

66. Dr. Bhattacharya was assigned to work in office 321 A.

67. In contrast to explicit representations made to Dr. Bhattacharya during the hiring process, he was not given a separate lab in which to conduct his research.

68. Rather, Dr. Bhattacharya's office and lab had been combined into a single unit. In order to reach his desk space, Dr. Bhattacharya and the students that he would be working with were required to walk through his lab space.

69. Dr. Bhattacharya's research involves the application of mechanical engineering to the human heart. The research requires a clean lab space that is not contaminated by environmental contaminants introduced when people walk through the space to reach his desk.

70. As a result, Dr. Bhattacharya was forced to keep the hearts he performs research on in a cryo freezer inside of the biology lab. He was not able to buy a cryo-freezer from his first GRFC grant as a result of the ongoing failure of SEMO to provide him with the promised space. As the grant money was approaching lapse in 2019, he was forced to spend the money on a cryofreezer that he did not have room for and had to be kept in his office.

71. By 2018, Dr. Bhattacharya was forced to submit a proposal to the Malinckrodt foundation due to the lack of support from SEMO in purchasing the needed equipment. But the application failed when the monetary contribution from SEMO was not there.

72. In contrast to the emphatic promises he received upon hire, SEMO experienced dramatic departmental changes originating around the time he was hired and taking effect around the middle of 2018.

### III.     SEMO's Financial Struggles and Department Realignment

73. By February of 2018, SEMO was well underway with making departmental changes.

74. In changes initiated by then Provost Karl Kunkel, SEMO underwent a "large-scale reorganization" that affected nearly every program in the school. Attached as Exhibit H is a true and correct copy of the Major Academic Restructuring Proposal.

75. The Restructuring Proposal was aimed primarily at addressing a significant budget reduction resulting from a nine-point state appropriation decline starting in Fiscal Year 2018. Ex. H at 2.

76. The Reorganization Proposal was intended to "ultimately benefit students" by locating similar programs under the same umbrella. *Id*.

77. The Reorganization Proposal stressed that "[t]here is no negative impact on students since programs are not being eliminated in connection with this reorganization" and that "[a]ll accreditations, current courses, options, and programs are maintained." *Id*.

78. The projected savings are attributed only to reductions in reductions in administrative staff. *Id*. at 11.

79. The Department of Physics and Engineering Physics, including Dr. Bhattacharya, were opposed to the realignment from the start. A February 2018 Memorandum from the Department of Physics and Engineering indicated their strong opposition to the name "Engineering and Technology" for what was then called Engineering Physics. *See* Ex. I, Department Response Emails.

80. The logical objection notwithstanding, the Department of Engineering and Physics also disagreed with the proposal because the existing Engineering Physics program was accredited by the Engineering Accreditation Commission of ABET, which is the sole accrediting body of engineering programs in the United States. *See* Ex. J, Official Department Response.

81. In addition, and in contrast to the cost reduction only model proffered by the Provost in their Proposal, SEMO had experienced increased enrollment and revenue from the existing Department of Physics and Engineering Physics dating back to the year 2000.

82. The Department of Physics and Engineering Physics in fact proposed a revision to the Engineering Physics program to include a Biomedical Applications option that "will grow enrollment adequately to justify the expense of maintain at least a department chair, if not an administrative assistant as well." *Id.* at 1. This Biomedical Applications program was the one Dr. Bhattacharya was hired to teach.

83. In addition, the Response proposes that SEMO establish a master's degree in Nano-bio-engineering and a plan to pursue a formal 3+2 arrangement enabling students to complete a degree in physics and an engineering degree elsewhere." *Id*. at 2.

84. On May 9, 2018, Defendant President Vargas issued a memorandum to SEMO faculty outlining why he "felt it necessary to outline an alternative restructuring proposal" that was more consistent with the President's vision for the University than that created and submitted consistent with the outlined procedure. Ex. K, Provost letter at 1.

85. Ignoring without reason the former Department of Engineering Technology and Engineering Physics proposal, Defendant Vargas fiat became law, placing Engineering Physics into a new program called Engineering and Technology.

**IV.     Dr. Bhattacharya's Is Enticed to Stay at SEMO by SEMO's Extravagant – but False – Promises.**

86. Dr. Bhattacharya persisted at SEMO even despite their clear breach of his contract with them, and Defendant Vargas elimination of the department he was hired to teach in, because switching university positions so quickly after starting would be frowned upon in his highly competitive field.

87. Dr. Bhattacharya took solace in what turned out to be empty promises in the Faculty Handbook. Indeed, the Faculty Handbook explicitly indicates that "[p]roviding evidence of scholarly or creative activity makes possible the judgement of peers within the

discipline" and is required for advancement to a tenure track position at SEMO. Ex. C at 97.

88. Dr. Bhattacharya found the soaring promises contained within the Faculty Handbook reason enough to persist until he obtained tenure track professorship.

89. The Faculty Handbook elegantly promises each tenured professor that "[a]cademic tenure is an agreement under which faculty appointments are continued until retirement, subject to dismissal for adequate cause or unavoidable termination on account of financial exigency or change of institutional program. The American Association of University Professors (AAUP) in the 1940 Principles on Academic Freedom and Tenure states that tenure is "a means to certain ends: specifically, (1) freedom of teaching and research and of extramural activities and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society" (Policy Documents and Reports, AAUP, 10th ed., 2006)." Ex. C at 81.

90. Tenure at SEMO was appealing not least because of SEMO's explicit endorsement of principles related to characteristics that resonated powerfully with Dr. Bhattacharya. SEMO promised Dr. Bhattacharya, and all other professors at SEMO, that "[n]o faculty members, whether tenured or not, shall have their employment terminated in violation of the principles of academic freedom and tenure." Ex. C at 81 ¶ 1.

91. SEMO indicates the sole criterion to be used when determining whether a tenured faculty member can be terminated: ". . . the employment of any tenured faculty member may be terminated at any time for due cause arising out of neglect of duty, incompetence, or moral turpitude." Ex. C at 81 ¶ 3.

92. SEMO's staff also indicated to Dr. Bhattacharya that they were working towards developing a program, enticing him with the promise of a new Biomedical Applications option for the engineering physics program. Ex. I at 2; Ex. J.

93. Indeed, in December of 2017, Dr. Bhattacharya's proposal for such curriculum was expressly approved. That proposal would have removed the computer applications and replaced it with biomedical applications. Ex. J.

94. Sadly, SEMO's promises amounted to little more than pretty words. At the same time Dr. Bhattacharya was lured in with their promises of honoring their commitment to his role as a research professor and instructor, a small group at SEMO was making big curriculum decisions without regard for their prior contracts.

**V.    SEMO's Promises Take a Backseat to their Bottom Line.**

95. By October 2019, the promises made to Dr. Bhattacharya – funding for research, space, and equipment to perform the same, instructing students in coursework within his area of expertise – had been repeatedly tabled, and were never taken up at meetings required for them to be instituted.

96. Indeed, Dr. Deken – Chair of the Department of Engineering Technology after Engineering Physics: Mechanical Applications was moved to that Department – indicates surprise that "*[for] some reason*, EP changes didn't make it onto this Academic Council for some reason." Ex. L, Deken Email (Emphasis supplied).

97. As Defendant Vargas moved to consolidate power behind his Departmental change package instituted the previous year, he worked simultaneously to undermine the opposition.

98. Dr. Bhattacharya felt cheated by Defendant Vargas' failure to use any provable, non-arbitrary rationale for making the decision to separate mechanical engineering from physics.

99. But Dr. Bhattacharya fought on, committed to the principles contained in the Faculty Handbook and with the expectation that SEMO would honor their promises in good faith.

100. Dr. Bhattacharya received positive reviews in 2018, 2019, and 2020. And, in consideration for his promise to perform research using the equipment he brought with him upon his hire in 2017, he received credit that pushed him over the required threshold to receive tenure in 2020. Ex. A.

101. Dr. Bhattacharya further excelled and was promoted when allowed to do what he was hired to do: help undergraduate students perform research. To his students, Dr. Bhattacharya was known for having "high expectations." Ex. M. But his expectations served a legitimate pedagogical goal of insuring students became high quality engineers. And his method worked. His students were granted first authorship for prestigious journal publications, even after initially struggling in his classes. Ex. M.

**VI.    Departmental Reorganization Comes to a Head with New Lab Space Assignment**

        **i.    Dr. Bhattacharya is disciplined for spirited protest of the SEMO's assignment of preferred lab space to the "pure" science faculty.**

102. As the reality of how the Departmental Reorganization would impact the day-to-day work performed by the faculty became clear, the new Department of Physics and Chemistry coalesced around a self-interested support of the new alignment.

103. The change in position to support the reorganization by the Department of Chemistry and Physics was centered around access to lab and research space, which the changes provided to those faculty.

104. As a result of the reorganization, the Department of Chemistry and Physics was placed in a single building that had been newly constructed with state-of-the-art labs and apportioned with new equipment.

105. In contrast, the Department of Engineering and Technology was relegated to a distant building that featured predominately lecture style classrooms with computers.

106. Dr. Bhattacharya and Dr. Ghosh were assigned to perform their research in the same lab space as that assigned to students, whereas the Department of Chemistry and Physics professors each had their own labs.

107. The Department of Engineering and Technology did not have access to any of the lab equipment that Dr. Bhattacharya or his associate engineering professor Dr. Ghosh needed to do their research.

108. SEMO rationalized the decision by stating that the "pure" sciences – physics, chemistry, and engineering – belonged in a separate space from the more "applied" sciences like engineering. But the distinction between those domains is arbitrary and unprincipled.

109. The Department of Chemistry and Physics is predominately white. The sole mechanical engineering professors – Dr. Ghosh and Dr. Bhattacharya – are Indian.

110. As a result, the on the ground implication for how the 2019 departmental reorganization impacted the faculty only came to fruition a few years later, in 2020 and 2021. The clear outcome was that the Indian professors would be expected to walk 5 minutes to and from their lab space to do their research in student labs, without any of the equipment needed. In contrast,

the white faculty at the Department of Chemistry and Physics would be allowed to do their work on new equipment.

111. But Dr. Ghosh and Bhattacharya also were also much more active researchers than the Department of Chemistry and Physics professors, amplifying the clear message the administration was sending: we make the rules, and if you don't play along you will be punished.

112. Dr. Ghosh and Dr. Bhattacharya made complaints about their disparate treatment with the Office of Equity. *See* Exhibit O, Bhattacharya and Ghosh Complaint. The Office of Equity investigator vocally conveyed a finding that discrimination had occurred, but upon information and belief removed it at the direction of President Vargas or another member of SEMO's administration.

113. Dr. Bhattacharya made numerous objections to the reassignment. His viewpoint regarding the disastrous implications of the Departmental Realignment from 2018 were well known to the administration.

114. Indeed, Dr. Bhattacharya expressed his opinion at the time about the new research spaces, indicating that the new assignment was "Fucking racist." This comment served as the basis of the first complaint against him. *See* Ex. P, First Letter.

115. Dr. Bhattacharya's complaint was made to a fellow faculty member and only incidentally overheard by a student. His complaint occurred in a context of a meaningful academic debate about the institutional motivations for separating the "pure" and "applied" sciences.

ii.     **SEMO's Administration Manufactures Dispute to Punish Dr. Bhattacharya's Dissent**

116. President Vargas and his cronies sought to consolidate his administration's opposition to Dr. Bhattacharya's dissent by coordinating a targeted campaign of trumped of charges against Dr. Bhattacharya.

117. In the fall of 2021, Dr. Bhattacharya was assigned to teach a class in MG222. The class served as a lab that day for a lecture by Dr. Joe Murphy PhD, an assistant professor of a "pure" science, chemistry, and physics.

118. Dr. Murphy was assigned a staff and student assistant to coordinate the set up and break down of his lab.

119. Dr. Bhattacharya's lab schedule is the first lab of the day for that course. For that lab, Dr. Murphy is the main instructor and Dr. Bhattacharya only follows Dr. Murphy's instruction. On that particular lab day, Dr. Bhattacharya felt the instructions were adequate. However, there was some confusion about the needs for the lab because this lab was outside of Dr. Bhattacharya's area of expertise.

120. Compounding the difficulty, Dr. Bhattacharya could not fetch needed supplies from the Department of Physics stockroom, reserved for only "pure" science faculty.

121. Dr. Bhattacharya requested that the student assistant Derek assist with setting up the equipment.

122. Although Derek helped on that day, Dr. Bhattacharya protested Dr. Murphy's failure to assist him in providing even minimal assistance in setting up the equipment. *See* Email to Dr. Murphy.

123. Dr. Murphy forwarded the email to the rest of the faculty at the Department of Physics and Chemistry the same day. In concert with the direction of the administration and their advice

about creating a paper trail to rationalize the decision to terminate Dr. Bhattacharya, this incident became the basis for the second complaint against him. *See* Ex. Q, Summary Letter of Complaints.

### iii.   SEMO administration punishes Dr. Bhattacharya for telling a student the truth.

124. SEMO's commitment to an arbitrary decision between the "pure" and applied sciences motivated the continued manufacture of disputes with Dr. Bhattacharya.

125. At bottom, the issue was of fundamental importance given SEMO's precarious financial predicament.

126. In particular, the success of a particular Department or course of study is measured by the amount of students that complete the program.

127. Federal reporting guidelines mandate the use a Classification of Instructional Programs ("CIP") code to differentiate between programs of study. The CIP code provides a taxonomic scheme that supports the accurate tracking and reporting of success at institutions of higher education. Indeed, the CIP program functions to determine in part receipt of federal student aid funding.

128.  One criterion for the classification of a particular program is the required background of the Professor to teach it. CIP code 15 faculty cannot teach engineering classes because they do not have the correct background.

129.  Engineering classes are further accredited by the Accreditation Board for Engineering and Technology ("ABET"). The ABET program mandates minimum educational criterion for students to qualify to take exams to become professional engineers. *See* Exhibit R.

130.   The changes to the department alignment in 2019 that forced the separation between the "pure" and applies sciences at SEMO caused catastrophic damage to the programs Dr. Bhattacharya and Dr. Ghosh were assigned too.

131.   As a result, by late 2021, the Industrial and Systems Engineering program was nervous about not receiving ABET accreditation.

132.   In fact, the curriculum changes at SEMO – designed to boost enrollment and manufacture completion of "engineering" degrees – motivated numerous substitutions, including by emphasizing and requiring only easier classes.

133.   These changes were intentionally misleading to SEMO students, who were told they were enrolling in an "engineering" program that did not qualify student's to be engineers.

134.   The classification of the programs as "engineering" was reflected on the website, which promised students that they could expect a career in engineering after completing the program in Engineering Technology: Mechanical and Manufacturing Systems.

135.   But Dr. Bhattacharya knew the truth. SEMO's ongoing denigration of the programs required courses, including by diluting the Mechanical Design Process course from a three-semester instruction to one semester and an across-the-board reduction in requirements for high level math. This rendered the Industrial and Systems Engineering program ineligible for ongoing accreditation by ABET.

136.   On October 26, 2021, the conflict between the reality of SEMO's "Engineering and Technology" course requirements and the explicit promises they were making students came to a head.

137. Dr. Bhattacharya on that day was speaking with students after class. The discussion was about engineering, and the qualifications to become an engineer. One student approached him following the discussion. *See* Exhibit S, Marin Complaint.

138. Dr. Bhattacharya told the student that the engineering technology program at SEMO was "a diluted form of engineering." He further indicated that people in the engineering technology program should not self-identify themselves as engineers, because doing so could cause confusion. *See* Jose Marin Complaint.

139. The student revealed he was having significant difficulties in the course, which required basic level understanding of concepts essential to engineering.

140. When the student complained about the difficulty of the material, Dr. Bhattacharya informed the student that he would not dilute his course work. He told the student that if he couldn't do the work, he needed to drop the course.

141. Dr. Bhattacharya's remarks were informed by a fundamental pedagogical commitment to not hiding the rigors and complexity of modern engineering. No matter what SEMO's orthodoxy proposed, the truth – as recognized by the federal government and the ABET – was that SEMO's "engineering technology" courses were not courses about engineering.

142. For speaking this truth, SEMO escalated it's attack on Dr. Bhattacharya. In December of 2021, he was given notice for the first time of the complaints against him. He was subjected to an interrogation that did not include the opportunity to view any of the above three complaints in advance.

## VII.    SEMO FIRES DR. BHATTACHARYA UNDER THE PRETEXT OF MISCONDUCT

143. Dr. Bhattacharya complained about the arbitrariness of the decisions to the Office of Equity and Diversity, but the complaints were silenced.

144. Dr. Bhattacharya's complaint was co-signed by another associated professor, Dr. Ghosh.

145. The complaint was heard by an administrator in the Office of Equity and Diversity, who told them in a tape-recorded conversation that she had identified incidents of discrimination against them but that they could not be prosecuted for administrative reasons.

146. In contrast, the three above-described complaints against Dr. Bhattacharya were quickly escalated to the highest administrative level at SEMO.

147. In October of 2021, Dr. Bhattacharya received correspondence from Defendant Alissa Davis indicating that Dr. Bhattacharya had violated the University Business Policy and Operating Procedures, but never referencing which part had been violated. *See* Letter to Bhattacharya October 2021.

148. In December of 2021, Dr. Bhattacharya received a correspondence from Defendant Provost Godard, highlighting the complaints allegedly made against Dr. Bhattacharya and described above in Section VI(i)-(iii). The letter indicates that "consistent with university policy and procedure, I have asked Dr. Deken to convene a departmental review committee to determine your fitness to continue in your employment . . ." Ex. Q.

149. The December letter parroted the October letter, but made no reference to explicit factual findings or investigation into the matter. Both letters are upon information and belief manufactured opposition to Dr. Bhattacharya's dissent originating from Defendants.

150. In fact, although both letters reference established policies and practices for termination of tenure track professors, none provide any reference for what those policies and practices actually are.

151. Finally on January 19, Dr. Bhattacharya received a letter from Defendant Vargas himself stating that ". . . upon review both memorandums outline several actions that you have

neglected your professional responsibilities owed Southeast Missouri State University under your April 17, 2017 contract." *See* January notice. Although the letter addresses "several" memoranda, none were provided to Dr. Bhattacharya before his hearing scheduled for April 13, 2022, despite his request for the same.

152. Following this and still in December, Dr. Bhattacharya was approached by a group of administrators who told him that he could resign and take a small severance, or alternatively allow his case to proceed before the disciplinary board where he would be fired.

153. Dr. Bhattacharya throughout the months of September, October, and November was never provided any written notice of the contents of complaints made against him. Even upon his request, he was urged by the administration to trust that the complaints existed.

154. Finally in January of 2022, Dr. Bhattacharya received correspondence from Defendant President Vargas indicating

155. In March of 2022, despite not following any of the procedures outlined in the Faculty Handbook for discharge of a professor, Dr. Bhattacharya's course load was taken away. He was assigned to perform minor clerical functions in advance of a scheduled sham disciplinary hearing, the conclusion of which has already been reached by President Vargas.

## COUNT 1: VIOLATION OF DR. BHATTACHARYA'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH AND RETALIATION (42 U.S.C. § 1983)

156. Plaintiff Bhattacharya restates all allegations in this Complaint here again.

157. By punishing and terminating Dr. Bhattacharya for expressing his views regarding SEMO's motivations and rational for the departmental changes, Defendants have retaliated and are retaliating against Dr. Bhattacharya for exercising his First Amendment Rights.

158. Dr. Bhattacharya's communication that the assignment of lab space was "fucking racist" occurred in the context of a conversation with a colleague and was motivated by legitimate pedagogical concerns about SEMO's decisions and their impact on students.

159. Dr. Bhattacharya's subsequent communication to the faculty member about the need to keep the lab well organized was similarly part of Dr. Bhattacharya's general critique of the inefficiency of the distinction being made between "pure" scientists and engineers.

160. Dr. Bhattacharya's communication to the student was made to serve the legitimate pedagogical need of informing students about the necessary course work to become an engineer. His speech related to a matter of political, social, and pedagogical concern to the community and transcends personal interest.

161. Dr. Bhattacharya's interest as a tenured professor at a public university in discussing the pedagogical benefits of SEMO's departmental changes and subsequent policies is compelling.

162. The consolidated Defendants interest in promoting efficiency is far outweighed by Dr. Bhattacharya's interest because his legitimate pedagogical concerns are directed towards achieving efficiency.

163. Further, Dr. Bhattacharya's speech never impacted Defendants provision of services. Indeed, Defendants provision of services was substantially worsened by their failure to follow reasonable, previously existing university policies like allowing staff to share student aid assistance.

164. Dr. Bhattacharya's speech is protected expression.

165. Defendants took retaliatory and unconstitutional actions against Dr. Bhattacharya pursuant to their unrestrained and arbitrary powers.

166. Defendants' actions were expressly directed at chilling others from expressing a similar viewpoint. In fact, another similarly situated person – Dr. Ghosh – has already suffered chilled speech in that he was afraid to support Dr. Bhattacharya in this lawsuit lest he suffer the same penalty.

167. Defendants were empowered by the terms of the faculty handbook to terminate Dr. Bhattacharya because of their financial situation. Instead, they chose to make an example out of him to dissuade others from questioning their authority.

168. Defendants' retaliatory and unconstitutional actions against Dr. Bhattacharya would deter a person of ordinary firmness from exercising their right to speech in the future.

169. Defendants' retaliatory and unconstitutional actions against Dr. Bhattacharya constate adverse employment action.

170. Defendants undertook these actions because of Dr. Bhattacharya's viewpoint regarding the pedagogical changes undertaken by Defendants.

171. Defendants' retaliatory and unconstitutional actions against Dr. Bhattacharya violate his right to free speech under the First Amendment to the United States Constitution.

#### COUNT 2: VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH VIOLATION AND VIEWPOINT DISCRIMINATION

172. Plaintiff restates all other allegations in this Complaint here again.

173. Defendants evaluated the content and viewpoint of Dr. Bhattacharya's speech to determine whether they would take adverse employment action against him based upon his speech about the departmental realignment.

174. Defendants considered the content and viewpoint of Dr. Bhattacharya's speech when they repudiated his tenure contract.

175. Defendants retain in virtue of the faculty handbook unbridled discretion to discriminate on the basis of viewpoint.

176. Defendants exercised this discretion when they repudiated Dr. Bhattacharya's contract and fired him because he expressed his views regarding the departmental realignment.

177. Defendants have punished Dr. Bhattacharya for engaging in First Amendment protected speech.

178. Defendants express purpose in meting out their arbitrary punishments to Dr. Bhattacharya was to deter other people from expressing similar dissent.

179. Defendants' retaliatory and unconstitutional actions against Dr. Bhattacharya violate his right to free speech under the First Amendment of the United States Constitution.

### COUNT 3: VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH – UNCONSTITUTIONAL CONDITIONS OF EMPLOYMENT AND ATTEMPT TO ESTABLISH ORTHODOXY

180. Plaintiff restates all other allegations in this Complaint here again.

181. Plaintiff's continued employment with the University was compromised when he expressed his viewpoint regarding the departmental realignment.

182. Defendants by their interpretation and application of the Faculty Handbook to Dr. Bhattacharya's protected speech attempt to punish Dr. Bhattacharya for exercising his right to free speech.

183. Defendants by their promulgation and publishing of marketing materials define their Industrial Systems program as engineering, when in fact it is not an engineering program.

184. Dr. Bhattacharya's interest in continued employment cannot be denied on the basis of his dissent.

185. Dr. Bhattacharya told the student the truth when he stated that SEMO's "engineering" curriculum was diluted. He was entitled and hired to do the same.

186. Defendants' insistence on trumping up minor charges against Dr. Bhattacharya is done expressly to punish Dr. Bhattacharya for his refusal to self-censor and stop speaking about matters of public concern.

187. Defendants seek to punish Dr. Bhattacharya for his disagreement with their attempted orthodoxy regarding the engineering curriculum.

188. Defendants action seek to compel Dr. Bhattacharya and other similarly situated faculty to adhere to Defendants' prescribed orthodoxy about the necessity and rationale for the departmental changes.

189. Defendants seek to tell Dr. Bhattacharya what he can and cannot say about matters of fundamental importance. If Dr. Bhattacharya does not adhere to Defendants' prescribed orthodoxy, Defendants' state that he cannot work at SEMO. The same is repugnant to the First Amendment of the United States Constitution.

## COUNT 4: VIOLATION OF PLAINTIFF'S RIGHT TO DUE PROCESS OF LAW

190. Plaintiff restates all other allegations in this Complaint here again.

191. Plaintiff Bhattacharya was a tenured professor and had a legitimate claim of entitlement to employment.

192. Dr. Bhattacharya's tenure contract expressly incorporated the terms of the pre-existing April 2017 agreement. The tenure contracted extended the terms and protections of his employment consistent with the Faculty Handbook.

193. The Faculty Handbook defines tenure as "…an agreement under which faculty appointments are continued to retirement, subject to dismissal for adequate cause or

unavoidable termination on account of financial exigency or change of institutional program." Ex. C at 81.

194. The Faculty Handbook further provides that "…employment of any tenured faculty member may be terminated at any time for due cause arising out of neglect of duty, incompetence, or moral turpitude." Ex. C at 81.

195. The Faculty Handbook finally provides that tenure once granted "is not lost through a reduction in teaching load for administrative, professional, or personal reasons if approved by Southeast. Nor may tenure be lost through the taking of leaves or other alterations in assignment if sanctioned by Southeast."

196. Defendants in their September and October complaint letter to Dr. Bhattacharya reference his violation of university practices and policies but fail to reference any with particularity.

197. Defendant Vargas in his January letter similarly repeats the same, emphasizing that both the September and October incidents together support his recommendation to terminate Dr. Bhattacharya's employment.

198. Defendants' emphasis of these incidents despite any comparison of the behavior with the explicit standards for tenured faculty termination out lined in the Faculty Handbook evidences their intent to silence Dr. Bhattacharya for his speech.

199. The policies and procedures outlined in the faculty handbook are unconstitutionally vague with reference to prohibited conduct. Similarly, the process standards contained in Defendant's business process manual does not address with any particularity conduct intended to be prohibited.

200. The standards upon which Dr. Bhattacharya is being evaluated are unconstitutionally vague.

201. The vagueness of the standards makes ripe Defendants ongoing attempt to punish Dr. Bhattacharya for engaging in protected First Amendment speech and to establish and unlawful government orthodoxy about the meaning of "engineering" and pedagogical approaches to engineering education.

202. Defendants' efforts at establishing an unlawful orthodoxy restricting criticism of SEMO's pedagogical methods also make any hearing they provide insufficient.

203. Defendants have not and will not offer Professor Bhattacharya a fair hearing before a tribunal that meets currently prevailing standards of impartiality.

204. Defendants have not and will not provide Professor Bhattacharya with materials necessary for his fair and impartial defense.

### COUNT 5: VIOLATION OF MISSOURI ADMINISTRATIVE LAW – ARBITRARY AND CAPRICIOUS DECISION MAKING; ARTICLE II, § 1 OF THE MISSOURI CONSTITUTION; AND, FEDERAL PROCEDURAL DUE PROCESS RIGHTS

205. Plaintiff restates all other allegations in this Complaint here again.

206. Article II, § 1 of the Missouri Constitution provides that "[t]he powers of government shall be divided into three distinct departments — the legislative, executive and judicial — each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in instances in this constitution expressly directed or permitted."

207. Mo. Rev. Stat. § 536.018 provides that ""agency" and the term "state agency" as defined by Section 536.010 shall not include an institution of higher education, supported in whole or in part from state funds, <u>if such institution has established written procedures to assure that constitutionally required due process safeguards exist</u> and apply to a proceeding that would

otherwise constitute a "contested case" as defined in section." *See* Mo. Rev. Stat. § 536.010 (Emphasis Supplied).

208. Southeastern Missouri University does not have such established written procedures.

209. Pleading hypothetically and in the alternative, Southeastern Missouri State University does have such procedures, but they are without any force or effect on the actual decision-making process and do not afford tenured faculty necessary procedural due process protections required for contested cases per Mo Rev. Stat. § 536.063 *et seq.*

210. The Missouri legislatures delegation of authority to Defendants Southeast Missouri Board of Regents does not confer upon them the ability to establish judicial rights and procedures that do not comport with Missouri separation of powers constitutional provisions and deny tenured faculty like Plaintiff Bhattacharya even basic due process protections like the ability to conduct depositions, receive evidence in advance of confrontation, and decision making based upon a record.

211. The Board of Regents in their delegation of authority to President Vargas delegate power in excess of that delegated to them by the legislature in that the Board of Regents' By-Laws purport to delegate both adjudicatory and legislative functions to the President without any limitation on his discretion.

212. The Board of Regent's by-laws provide no mention of the authority of the Faculty Senate, which proceeds apparently on the basis of tradition and has no legal authority to provide rules of behavior for faculty at SEMO despite elaborate representations to the contrary.

213. As a result, faculty at SEMO have no ability to understand the mechanism by which their behavior will be evaluated or punished. All of the standards promulgated by the Faculty

Senate, including the Faculty Handbook, are marked with the imprimatur of officiality in an effort to deceive faculty.

214. Although President Vargas pays lip service to pre-defined procedures for faculty discipline, his letter and the conduct of his administration makes abundantly clear that the authority to discipline and discharge Professor Bhattacharya lay entirely with him.

215. Because the power of Defendant President Vargas is entirely unconstrained, he is invested with nearly dictatorial power over affairs at SEMO. That power is unlawful.

216. Defendant President Vargas exercise of that power without reference to factual findings or proper investigations resulted in the decision to transform the school's department divisions, with disastrous results for tenured faculty hired before the changes.

217. Defendant President Vargas and Board Defendants decision to reorganize the departments was arbitrary and capricious.

218. Defendant President Vargas and the Board Defendants failed to follow procedure applicable to contested cases under Missouri administrative law related to the disciplinary action at present proceeding against Dr. Bhattacharya.

**COUNT 6: BREACH OF CONTRACT OR IN THE ALTERNATIVE ANTICIPATORY BREACH OF CONTRACT**

219. Plaintiff restates all other allegations in this Complaint here again.

220. Defendants breached their contract with Plaintiff first when they refused to honor the April 2017 agreement by providing him with necessary lab space to facilitate ongoing renewals of their research grant.

221. Defendants further breached their contract with Plaintiff by failing to follow the applicable policies for termination of a tenured faculty member.

222. By reassigning Dr. Bhattacharya to perform solely administrative functions during the spring semester in 2022, the University broke its contract with him.

223. Pleading hypothetically and in the alternative, Dr. Bhattacharya by being reassigned to job duties not commensurate with the expectations outlined in the Tenure Contract breached its contract with him.

224. Pleading hypothetically and in the alternative, Defendants are soon to breach their contract by commencing a show trial to provide post hoc rationalizations to support their decision to terminate Dr. Bhattacharya.

225. Defendants have no legal excuse for the breach of Dr. Bhattacharya's contract.

## Prayer for Relief

WHEREFORE having described his Complaint against the Defendants, Plaintiff Shamik Bhattacharya respectfully requests this Court enter judgement against Defendants and provide the following relief:

A. A declaratory judgement that Defendants violated the First and Fourteenth Amendments and breached their contract with Dr. Bhattacharya;

B. A declaratory judgement that Defendants violated Article II, Section 1 of the Missouri Constitution and Mo. Rev. Stat. § 536 *et seq* through their failure to adopt reasonable rules sufficient to protect the due process interests of those affected by their authority, and through their failure to undertake the faculty reorganization without adequately investigating facts relevant to determination;

C. A preliminary and permanent injunction ordering Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf:

      a.   To restore Dr. Bhattacharya to his tenured position;

      b.   To honor Dr. Bhattacharya's contract;

      c.   To purge reference to this incident from Dr. Bhattacharya's file;

      d.   To enjoin ongoing disciplinary proceedings against Dr. Bhattacharya.

D.  A preliminary and permanent injunction prohibiting Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the challenged provisions of the Faculty Handbook;

E.  Normal, compensatory, and punitive damages for the violation of Dr. Bhattacharya's First and Fourteenth Amendment and contractual rights, including lost wages and reputational harm;

F.  Dr. Bhattacharya's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988;

G.  Trial by jury for all fact questions to which Dr. Bhattacharya is entitled to such trial.

H.  All such further relief as may be just and proper under the circumstances.

**Verified Signature of Plaintiff**

By signing below, I certify to the Court that I have assisted in the creation of and reviewed the Complaint filed by my counsel, Ott Law Firm. I certify that all allegations are true and correct to the best of my knowledge and belief under penalty of perjury.

*Shamik Bhattacharya*

Dr. Shamik Bhattacharya, PhD

Notary Witnessed

STATE OF MISSOURI          )
                                          )
COUNTY OF *Cape Girardeau*

Dr. Shamik Bhattacharya, Plaintiff in the above-entitled cause, being of full age and being first duly sworn upon his oath, states that he has read and understands the foregoing Complaint; and that the facts contained therein are true to the best knowledge and belief of this affiant and he has executed the same as his true and correct, free act and deed.

Subscribed and sworn to before me this *1st* day of *April*, 2022.

*[signature]*

NOTARY PUBLIC

My Commission Expires: *6-22-23*

DEBBIE PROFILET
Notary Public-Notary Seal
STATE OF MISSOURI
Cape Girardeau County
15387826
My Commission Expires June 22, 2023

Respectfully submitted,

**OTT LAW FIRM**

*Jo Ott*

Joseph A. Ott, #67889
3407 S. Jefferson Avenue, Ste 508
St. Louis, MO 63119
Telephone:  (314) 293-3756
Facsimile:  (314) 689-0080
*Attorneys for Plaintiffs*