**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| DR. SHAMIK BHATTACHARYA, PHD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:22-cv-00043-MTS |
| | ) | |
| THE BOARD OF REGENTS OF | ) | |
| SOUTHEAST MISSOURI STATE | ) | |
| UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. [11]. For the reasons set forth below, the Court will grant Defendants' Motion in part and dismiss Plaintiff's claims arising under federal law. Since only claims arising under state law remain, the Court considers whether to exercise supplemental jurisdiction over them and declines to do so. Therefore, the Court will dismiss those state law claims without prejudice and deny the Motion to Dismiss without prejudice as to those claims.

## I.    BACKGROUND

Plaintiff Shamik Bhattacharya is[1] a tenured professor of mechanical engineering at Southeast Missouri State University ("SEMO" or "the University"), a public university located in

---

[1] Plaintiff is less than clear on whether he remains a tenured professor or whether he has been fired. *Compare, e.g.*, Doc. [1] ¶ 1 (alleging Plaintiff *was* a tenured professor), *and id.* ¶ 6 (alleging SEMO fired Plaintiff), *with id.* ¶ 12 (alleging Plaintiff *is* a tenured professor), *and id.* ¶ 152 (alleging administrators told Plaintiff he *would be* fired at the disciplinary board, which had not happened, *if* he did not resign), *and* Doc. [3] at 2 (asking the Court to issue a temporary restraining order that would have enjoined Defendants from proceeding with an imminent disciplinary proceeding where Plaintiff "was to be terminated"), *and* Doc. [16] at 21 (discussing his *scheduled* hearing before the disciplinary board "where he would be fired" if he did not resign). And while Plaintiff explicitly pleaded some facts in the alternative, see, *e.g.*, Doc. [1] ¶ 223, he never did so in regard to whether he still has his position.

Cape Girardeau.  *See* Mo. Rev. Stat. § 174.020.  He filed the instant action against a slew of

SEMO-related Defendants: the University's Board of Regents,[2] the President of the University

Carlos Vargas, and several other additional University officials.[3]  Plaintiff alleges that he voiced

his displeasure with the University's realignment of its engineering program, and, when he did,

Defendants, in concert, "acted ruthlessly to crush his dissent."  Doc. [1] ¶ 6.  The University took

away his course load and, in its place, assigned Plaintiff to perform "minor clerical functions."  *Id.*

¶ 155. Eventually, Plaintiff says, the University began the process of terminating him and set a

formal termination hearing.

In this action, Plaintiff asserts six counts against Defendants.  Counts One, Two, and Three

allege violations of the First Amendment actionable under 42 U.S.C. § 1983.  Count Four alleges

a violation of Plaintiff's "right to due process of law," presumably under § 1983 as well.[4]  In Count

Five, Plaintiff amalgamated a claim he dubs "violation of Missouri administrative law – arbitrary

and capricious decision making; Article II, § 1 of the Missouri Constitution; and, federal

procedural due process rights."  Finally, Count Six alleges a breach of contract claim or, in the

---

[2] Plaintiff seemingly intended to refer to SEMO's Board of Governors.  *See* Mo. Rev. Stat. § 174.450.1.  Plaintiff's Complaint identifies these persons as: President Edward P. Gargas, Vice President Tina L. Klocke, Member David C. Martin, Member Lloyd F. Smith, Member James P. Limbaugh, and Member Vivek Malik.  The Complaint further notes that Plaintiff brings this action against them in their "individual and official capacities."  Doc. [1] ¶ 41.

[3] The additional Defendants are: Provost Mike Godard; Dean of the College of Science, Technology, Engineering and Mathematics Tamela Randolph; Chairperson for the Department of Engineering and Technology Bradley Deken; and Director of Human Resources Alissa Davis.  Plaintiff brings the action against them in their "individual and official capacities."  Doc. [1] ¶ 41.

[4] Plaintiff did not identify a provision establishing the right to due process of law he alleges Defendants violated in Count Four.  *See, e.g.*, U.S. Const. amend V; U.S. Const. amend XIV; Mo. Const. art. 1, § 10.  Nor for this Count did Plaintiff identify how he brings this cause of action.  *See, e.g.*, 42 U.S.C. § 1983; *Toure v. Hott*, 458 F. Supp. 3d 387, 401 (E.D. Va. 2020) (discussing the "implied cause of action for equitable relief to remedy constitutional violations" (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the state to do."))).  Based on allegations he made elsewhere, it appears this claim is one for violation of due process under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, but since Plaintiff "restate[d] all other allegations" within his Complaint in Count Four, Doc. [1] ¶ 190, it makes the Count far from clear.  *See Arch Energy, L.C. v. City of Brentwood*, 4:22-cv-00499-MTS, 2022 WL 4464758, at *2 n.1 (E.D. Mo. Sept. 26, 2022) (discussing the issues that can arise with shotgun pleadings).

alternative, anticipatory breach of contract related to Plaintiff's tenure contract, both presumably under Missouri common law.

Plaintiff initially sought a temporary restraining order to block the University from "proceeding with a disciplinary hearing scheduled to occur on April 13, 2022," and from "continuing disciplinary proceedings against [him]." Doc. [3] at 1. The Court denied Plaintiff's request. Doc. [7]. Now before the Court is Defendants' Motion to Dismiss Plaintiff's action altogether under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For a pleading to state a claim for relief it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The complaint must contain facts sufficient to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" when the plaintiff pleads factual content that allows the court to draw the "reasonable inference" that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. When considering a Rule 12(b)(6) motion, the Court assumes all of a complaint's factual allegations are true and makes all reasonable inferences in favor of the nonmoving party. *See Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989); *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014). However, the Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

III.     **DISCUSSION**

A. **Facts**

Plaintiff alleges that, beginning in 2017, SEMO altered its departmental organization in an effort to increase enrollment at the University.  It created an "engineering technology" program to prepare students for "industrial careers such as engineering."  Doc. [1] ¶ 5.  Plaintiff, a tenured professor of mechanical engineering at SEMO, did not approve of the reorganization, and he made his disapproval known to others.  Plaintiff asserts that the University has retaliated against him for voicing his disapproval of the reorganization.  Specifically, Plaintiff maintains that the University has punished him for "three incidents" where he spoke negatively about the reorganization.  Doc. [16] at 11.

The first incident stemmed from the assignment of lab space following SEMO's departmental reorganization.  The University placed the Department of Chemistry and Physics in a single, newly constructed building with state-of-the-art labs and new equipment, but the University relegated the Department of Engineering and Technology "to a distant building that featured predominately lecture style classrooms with computers."  *Id.* ¶ 105.  Worse still, Plaintiff and the other Department of Engineering and Technology professor faced the calamitous condition of being forced to perform research "in the same lab space as that assigned to students," unlike the Department of Chemistry and Physics professors who "each had their own labs."  *Id.* ¶ 106.  Since the Department of Chemistry and Physics professors are "predominately white," and Plaintiff and the only other Department of Engineering and Technology professor "are Indian," the "clear outcome was that the Indian professors would be expected to walk [five] minutes to and from their lab space to do their research in student labs, without any of the equipment needed" whereas the "white faculty" was "allowed to do their work on new equipment."  *Id.* ¶ 109–10.  While

4

complaining to a fellow faculty member in a conversation that was, "incidentally overheard by a student," Plaintiff stated that the lab assignment was "fucking racist." *Id.* ¶ 114–15. The University's Office of Institutional Equity and Diversity received a complaint against Plaintiff regarding this verbal exchange.[5] Plaintiff alleges this verbal exchange "occurred in a context of a meaningful academic debate about the institutional motivations" for the departmental reorganization. *Id.* ¶ 120.

The second incident also stemmed from Plaintiff's discontent over lab assignments. This time, Plaintiff was assigned to a class in a lab that, the same day, served as lab for another professor's lecture. Plaintiff "could not fetch needed supplies from the Department of Physics stockroom" because it was "reserved for only 'pure' science faculty." *Id.* ¶ 120. Via an email to the professor, Plaintiff "protested" the professor's "failure to assist [Plaintiff] in providing even minimal assistance in setting up the equipment." *Id.* ¶ 122. That professor forwarded Plaintiff's email to the rest of the faculty at the Department of Physics and Chemistry, and a second complaint was filed against Plaintiff with University officials. Plaintiff alleges that, "[i]n concert with the direction of the administration and their advice about creating a paper trail to rationalize the decision to terminate [him], this incident became the basis for the second complaint against [Plaintiff]." *Id.* ¶ 123.[6]

The final event for which the University's administration "punishe[d]" Plaintiff was for what the University deemed a coarse interaction with a student—or, as Plaintiff puts it, "telling a

---

[5] Plaintiff attached the complaint letter as an exhibit to his Complaint. *See* Doc. [1-15]. The complaint letter describes the fracas as a forty-five-minute verbal exchange with another faculty member in which Plaintiff became "increasingly loud and agitated" while "yelling" about another individual and calling that individual a "derogatory name" while also "using profanity." *Id.* The letter notes a third faculty member nearby "was forced to relocate his meeting with students due to [Plaintiff's] excessively loud yelling." *Id.*

[6] Plaintiff also attached this complaint letter as an exhibit to his Complaint. *See* Doc. [1-16]. The complaint letter notes that Plaintiff's "accusations in [the] email correspondence were disproven by the available documentation on file." *Id.* at 1.

student the truth." *Id.* at 22.  Plaintiff alleges that the University was "intentionally misleading" its students regarding its engineering programs. *Id.* ¶ 133.  One day after a class, Plaintiff spoke with a group of students about engineering and the qualifications to become an engineer.  After the discussion, one of the students approached Plaintiff, and Plaintiff told the student that SEMO's engineering technology program was "a diluted form of engineering," and that people in the engineering technology program "should not self-identify themselves as engineers." *Id.* ¶ 138.  The student revealed to Plaintiff that the student "was having significant difficulties" in Plaintiff's course. *Id.* ¶ 139.  As the student "complained," as Plaintiff puts it, about the difficulty of the material, Plaintiff told the student that Plaintiff "would not dilute [the] course work," and that "if [the student] couldn't do the work," then the student "needed to drop the course." *Id.* ¶ 140.  Plaintiff asserts that "[f]or speaking this truth, SEMO escalated [its] attack on [him]." *Id.* ¶ 142.

The University's provost, Defendant Godard, sent Plaintiff a correspondence highlighting the complaints made against him regarding the three events discussed above.  The letter notes that the provost had requested that a "departmental review committee" be convened "to determine [Plaintiff's] fitness to continue in [his] employment." *Id.* ¶ 148.  Plaintiff alleges, albeit just on "information and belief," that the letter was "manufactured opposition to [Plaintiff's] dissent." *Id.* ¶ 149.  Plaintiff later received a letter from Defendant Vargas that stated that "several" of Plaintiff's "actions" showed that he had "neglected [his] professional responsibilities" owed to the University under his contract. *Id.* ¶ 151.  A short time later, in December 2021, "a group of administrators" told Plaintiff that "he could resign and take a small severance, or alternatively allow his case to proceed before the disciplinary board where he would be fired." *Id.* ¶ 152.  In March 2022, Plaintiff's "course load was taken away," and he was "assigned to perform minor

clerical functions in advance of a scheduled sham disciplinary hearing, the conclusion of which," Plaintiff alleges, "ha[d] already been reached by President Vargas." *Id.* ¶ 155.

## B.  First Amendment Claims

Counts One, Two, and Three each allege violations of the right to freedom of speech under the First Amendment actionable under 42 U.S.C. § 1983.  Plaintiff calls them: First Amendment Right to Freedom of Speech and Retaliation (Count One); First Amendment Right to Freedom of Speech Violation and Viewpoint Discrimination (Count Two); First Amendment Right to Freedom of Speech – Unconstitutional Conditions of Employment and Attempt to Establish Orthodoxy (Count Three).

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," including the freedom of speech protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  But public employees, like Plaintiff, "do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417. Thus, "in certain circumstances," the First Amendment protects a public employee's right "to speak as a citizen addressing matters of public concern." *Id.*  In *Garcetti*, the Supreme Court "noted two inquiries in determining whether public employee speech is protected against employer retaliation." *Nagel v. City of Jamestown*, 952 F.3d 923, 929 (8th Cir. 2020).

> The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.  If the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 418 (citations omitted); *accord Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833 (8th Cir. 2015) (explaining that if "the possibility of a First Amendment claim has arisen," then the second inquiry is to "ask whether the employer has produced evidence

to indicate the speech had an adverse impact on the efficiency of the employer's operations" (internal quotations and alterations omitted)).

Whether an employee spoke as a citizen on a matter of public concern is a question of law for the court. *McGee v. Pub. Water Supply, Dist. No. 2 of Jefferson Cnty.*, 471 F.3d 918, 920 (8th Cir. 2006); *Lyons v. Vaught*, 781 F.3d 958, 961 (8th Cir. 2015). As such, in appropriate cases, it may be determined on a motion to dismiss under Rule 12(b)(6). *See City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam) (reviewing a Rule 12(b)(6) dismissal and having "no difficulty in concluding that [the employee's] expression d[id] not qualify as a matter of public concern under any view of the public concern test"); *see also, e.g.*, *Tarasenko v. Univ. of Ark.*, 63 F. Supp. 3d 910, 921 (E.D. Ark. 2014). Courts examine the "content, form, and context of a given statement, as revealed by the whole record" in assessing whether an employee's speech addresses a matter of public concern. *City of San Diego*, 543 U.S. at 83.

"A matter of public concern is a matter of political, social or other concern to the community." *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir. 2002). Put another way, public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego*, 543 U.S. at 83–84. The Supreme Court "has also recognized that certain private remarks, such as negative comments about the President of the United States, touch on matters of public concern." *Id.* at 84. Thus, "when a government employee speaks 'as an employee upon matters only of personal interest,' such as many personnel matters, the First Amendment does not offer protection." *McGee*, 471 F.3d at 920 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). "On the other hand, when a government employee speaks 'as a citizen'—that is, outside the scope of employment—on 'matters of public concern,' the First Amendment offers protection if the speech

survives the *Pickering* balancing." *Id.*; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (balancing "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees").

Not every scenario, however, fits neatly into one of these two categories. *Id.*  For example, take the scenario where a government employee "speaks upon a matter of public concern and does so in the course of his ordinary duties as a government employee." *McGee*, 471 F.3d at 920 (quoting *Garcetti*, 547 U.S. at 445 (Breyer, J., dissenting)).  The Supreme Court has held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.  As applied here, the Court concludes that Plaintiff was neither speaking as a citizen nor speaking on matters of public concern when he made the three "statements" or during the three "incidents" he detailed in his Complaint. *See* Doc. [16] at 11 (referring to the "three statements" and "the three incidents" for which Plaintiff has been "punished" or "disciplined").

An examination of the content, form, and context of Plaintiff's statements, when looking at the allegations in his Complaint as a whole, reveals that his speech did not address matters of public concern.  First, the Court examines the content.  "SEMO's assignment of preferred lab space to the 'pure' science faculty," Doc. [1] at 18, simply is not a concern to the community.  Nor is whether the engineering technology program is a "diluted form of engineering." *See id.* ¶ 138. The idiosyncrasies of inter-departmental laboratory space assignments and course offerings or program names within a particular college at a single university are not of interest to the general public.  It is not a political or social issue, and it cannot be said to be the subject of legitimate news

9

interest.  In that same way, the public has no concern in the small spats of public employees—*e.g.*, whether one professor provides "even minimal assistance" to another professor in setting up equipment for one class in a university's lab.  *See id.* ¶ 122.

The arguable aspect of public concern in the three incidents Plaintiff details is his remark to another professor that the University's lab assignments were "fucking racist."  *Id.* ¶ 115; *see also Connick*, 461 U.S. at 148 n.8 (noting "racial discrimination" is "a matter inherently of public concern").  But even when a public employee "raise[s] important public issues," the "'mere fact that the topic of [an] employee's speech [is] one in which the public might or would have had a great interest is of little moment.'"  *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 867 (8th Cir. 2009) (quoting *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993)); *cf. Gross v. Town of Cicero*, 619 F.3d 697, 706 (7th Cir. 2010) ("[S]ex discrimination in public employment can be a matter of public concern.  But it is not always so.  Purely personal grievances do not garner First Amendment protection, including personal grievances about sexual harassment in the workplace.").  The focus "remains on [the employee's] purpose in speaking."  *McCullough*, 559 F.3d at 867.  If an employee's "main motivation is to further a private interest, his 'speech is not protected, even if the public would have an interest in the topic of [his] speech.'"  *Nagel*, 952 F.3d at 930 (quoting *Anzaldua*, 793 F.3d at 833).

Some of Plaintiff's own allegations and argument suggest that his main motivation was furthering his own private interest, not on addressing a matter of public concern.  *See, e.g.*, Doc. [1] ¶ 102 (Plaintiff noting the reorganization's "impact" to the "day-to-day work performed by the faculty"); Doc. [16] at 5 (Plaintiff explaining that the reorganization "caus[ed] a disproportionate [e]ffect on [his] work").  Further, he "did not inform the public" about his concerns; his complaints "were entirely internal."  *McCullough*, 559 F.3d at 866.  These context factors "favor a conclusion

that his primary motivation was private." *Id.*; *see also, e.g.*, Doc. [1] ¶ 158 (stating that Plaintiff's "communication that the assignment of lab space was 'fucking racist' occurred in the context of a conversation with a colleague").[7]

At this motion to dismiss stage, however, the Court will not determine whether Plaintiff's main motivation was to further his private interest.  Rather, as the motion to dismiss standard requires, the Court takes Plaintiff's well-pleaded allegations as true and therefore assumes his communication that the "assignment of lab space was 'fucking racist' . . . was motivated by legitimate pedagogical concerns about SEMO's decisions and their impact on students." Doc. [1] ¶ 158.  In other words, Plaintiff does not allege or argue that his comment is in the public interest because racial discrimination is odious and always a matter inherently of public concern; rather, he alleges he made the remark about racism out of concern for the impact SEMO's reorganization would have on students.  The apparent disparate racial effect is derivative of his broader issue with reorganization.  As the Court previously discussed, this reorganization topic is not one of general public interest.  The public would not have an interest in the assignment of lab space or the reorganization of the engineering department within one college in one university.  Thus, his purpose was not "to raise issues of public concern," and, therefore, his remark was not protected from discipline.  *See Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007) (quoting *Bailey v. Dep't of Elementary and Secondary Educ.*, 451 F.3d 514, 518 (8th Cir. 2006)); *see also Connick*, 461 U.S. at 148 n.8 (explaining that something "not otherwise of public concern does not

---

[7] While a public employee does not give up his right to free speech simply because his speech is made in private or to a colleague or superior, *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16 (1979), "the internal nature of speech is a factor to be considered," *Sparr v. Ward*, 306 F.3d 589, 595 (8th Cir. 2002).  *See also Bailey v. Dep't of Elementary & Secondary Educ.*, 451 F.3d 514, 519 (8th Cir. 2006) (noting "circumstances" of a "private meeting" showed motivation in raising concerns "was not for public interest"); *Gordon v. Bd. of Trustees of the Univ. of Ark.*, 168 F. Supp. 3d 1148, 1158 (E.D. Ark. 2016) (remarking that the "context and form" of an employee's speech showed that he was acting primarily as an employee, rather than a concerned citizen, when he reported an issue "to his superiors").

attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest").

All three incidents of speech and expression occurred within the context of the workplace regarding employment related topics, which do not address any wider societal concern that Plaintiff has identified.  The content, form, and context of the three incidents show they were not speech of public concern.  But even if the Court deemed the issues a matter of public concern or primarily motivated by public concern, his speech was made pursuant to his official duties, not as a citizen.  *See Garcetti*, 547 U.S. at 421.  When public employees speak on a matter of public concern pursuant to their official duties, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id.*; *accord Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018) ("A public employee's speech is protected under the First Amendment if he spoke as a citizen on a matter of public concern, but a public employee's speech is not protected if he spoke pursuant to his official duties.").  The "critical question" in determining whether an individual is speaking as a citizen for First Amendment purposes is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane v. Franks*, 573 U.S. 228, 240 (2014).

Plaintiff's own allegations reveal that he made his speech pursuant to his duties as the University's employee.  "Speech is pursuant to an employee's duties if it is 'part-and-parcel of' the employee's concerns about his ability to 'properly execute his duties.'"  *Lyons v. Vaught*, 875 F.3d 1168, 1174 (8th Cir. 2017) (quoting *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)).  Regarding the first incident, as discussed, Plaintiff alleges that his "communication that the assignment of lab space was 'fucking racist' occurred in the context of a

conversation with a colleague and was motivated by legitimate pedagogical concerns about SEMO's decisions and their impact on students." Doc. [1] ¶ 158. He further states that this complaint "occurred in a context of a meaningful academic debate about the institutional motivations" for the University's reorganization. *Id.* ¶ 115. Regarding his conversation with his student, Plaintiff states that he told the student the "truth" about SEMO's "diluted" engineering curriculum and that he was "*hired* to do the same." Doc. [1] ¶ 185 (emphasis added). He further states that he made that communication with the student "to serve the legitimate pedogeological *need* of informing students about the necessary course work to become an engineer." *Id.* ¶ 160 (emphasis added); *see also McGee*, 471 F.3d at 921 ("[a] public employee's speech is not protected by the First Amendment if it 'owes its existence' to his professional responsibilities") (quoting *Garcetti*, 547 U.S. at 411). Regarding the email squabble over lab setup, Plaintiff alleges that he "was assigned to teach a class." *Id.* ¶ 117. Another professor was "the main instructor," and Plaintiff "follows [the other professor's] instruction." *Id.* ¶ 119. Plaintiff took umbrage to the other professor's "failure to assist him" in setting up the lab equipment because it affected Plaintiff's ability to properly execute his duties. *Id.* ¶ 122.

Plaintiff's own allegations show that these expressions were made pursuant to his official duties, *Buehrle v. City of O'Fallon*, 695 F.3d 807, 812 (8th Cir. 2012), were "about his ability to 'properly execute his duties,'" *Lyons*, 875 F.3d at 1174 (quoting *Williams*, 480 F.3d at 694), and "owed [their] existence to his professional responsibilities," *McGee*, 471 F.3d at 921. *See also Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) ("[W]e have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities[.]"). The First Amendment does not insulate his alleged expressions from employer discipline. *McGee*, 471 F.3d at 921; *Buehrle*, 695 F.3d at 812. Thus, even if the Court

13

concluded his speech was about a public concern, Plaintiff did not speak as a citizen. *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1081 (8th Cir. 2008) (finding that where an educator was speaking "merely as an employee concerned with [a school district's] internal policies and practices," she "was not speaking as a concerned public citizen"). His expressions, as pleaded, demonstrate they were made pursuant to official responsibilities. *See Garcetti*, 547 U.S. at 424.[8]

Because the Court has concluded that Plaintiff was not speaking as a citizen on matters of public concern, the Court does not reach the balancing prong of the *Pickering* test, *see City of San Diego*, 543 U.S. at 82–83 (explaining that in order to merit *Pickering* balancing, a public employee's speech must touch on a matter of "public concern" (quoting *Connick*, 461 U.S. at 143)), which "can rarely, if ever, be determined on a Rule 12(b)(6) motion to dismiss," *Lyons*, 781 F.3d at 961 n.1.

## C.  Right to Due Process of Law

In Count Four, Plaintiff alleges that Defendants violated his "right to due process of law." Doc. [1] at 30 (capitalization altered). As discussed, see *supra* n.4, the Court construes this claim as one under § 1983 for violation of the due process clause of the Fourteenth Amendment. Plaintiff asserts that the policies and procedures in the faculty handbook that led to President Vargas's recommendation to terminate Plaintiff's employment were "unconstitutionally vague" and, as such, the "standards upon which" Plaintiff was evaluated were "unconstitutionally vague." Doc. [1] ¶ 199–200. Plaintiff states that in the September and October complaint letters, where his violations of the University practices and policies were stated, they lack "particularity." *Id.* ¶ 196.

---

[8] Plaintiff argues that "a question remains whether *Garcetti* should apply in the academic setting," Doc. [16] at 16, but Plaintiff overstates this question and its applicability to this case. Plaintiff does not allege he is being disciplined for anything he said within "academic scholarship" or during "classroom instruction." *See Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006). So even if *Garcetti* would not apply in the same manner to a case involving speech within academic scholarship or classroom instruction, that is not at issue here.

Plaintiff further alleges that "Defendants have not and will not offer [Plaintiff] a fair hearing before a tribunal that meets currently prevailing standards of impartiality," *id.* ¶ 203, and will not provide him "with material necessary for his fair and impartial defense," *id.* ¶ 204.

The Fourteenth Amendment procedural right to due process "protects individuals from a state's impermissible deprivation of a protected property interest." *Wright v. Fam. Support Div. of Mo. Dep't of Soc. Servs.*, 458 F. Supp. 3d 1098, 1111 (E.D. Mo. 2020) (citing *Matthews v. Eldridge*, 424 U.S. 319 (1976)). Procedural due process claims consist of two elements: (1) the existence of a liberty or property interest entitled to due process protection, and (2) deprivation of that interest without sufficient notice and opportunity to present objections. *Wright*, 458 F. Supp. 3d at 1111 (citing *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)). If a plaintiff sufficiently pleads a constitutionally protected property interest, "the question remains what process is due." *Wright*, 458 F. Supp. 3d at 1112 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Here, Plaintiff sufficiently has alleged a property interest entitled to due process protection. Doc. [1] ¶ 191; *Wefel v. Rockwood R-6 Sch. Dist.*, 779 F. Supp. 468, 471 (E.D. Mo. 1991) (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). But he has not shown that he was deprived of that interest, let alone that he was deprived of that interest without sufficient notice and opportunity to present objections. Any claim Plaintiff may have under the Fourteenth Amendment for a deprivation of his property interest is not ripe at this time.

The ripeness doctrine flows both from Article III's limited jurisdictional grant to federal courts over "cases" and "controversies" as well as from prudential considerations for refusing to exercise jurisdiction. *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1037 (8th Cir.

15

2000).  The "basic rationale" for ripeness seeks "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Id.*  Therefore, before this Court may address a question, "there must exist 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'"  *Id.* 1037–38 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  While determining whether a claim is ripe "is one of degree," see *id.* at 1038 (quoting *Babbitt*, 442 U.S. at 297), and a limited subset of cases contingent in part on future possibilities "may warrant review based on their particular disposition," *id.*, this aspect of Plaintiff's due process claim is not one of them.

*First*, Plaintiff has not established that he formally has been fired.[9]  *See supra* n.1.  Thus, he has not established that he has been deprived of a property interest.  *Second*, Plaintiff's own allegations make clear that he was given notice and was set to be given an opportunity to be heard.  *See, e.g.*, Doc. [1] ¶¶ 142, 151, 154; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Draper v. City of Festus*, 782 F.3d 948, 953 (8th Cir. 2015).  The Court uses the phrase *was set to be given* a hearing because, according to Plaintiff's own Complaint, the hearing had not occurred when he filed this action.  Doc. [1] ¶¶ 155, 203.  Indeed, Plaintiff asked this Court to enjoin the hearing from happening, Doc. [3], which the Court declined to do, Doc. [7].  The date the University set for Plaintiff's termination hearing has passed, but Plaintiff has not sought leave to amend his Complaint or file a supplemental pleading.  *See* Fed. R. Civ. P. 15(a), (d).  Nor has Plaintiff otherwise informed the Court of the hearing's occurrence.  There is nothing before the

---

[9] Nor did Plaintiff allege in his Complaint that he has been "constructively" terminated or discharged.  *See generally* Doc. [1]; *see also, e.g.*, *Beeson v. Hudson*, 630 F.2d 622, 625 (8th Cir. 1980) (discussing plaintiff's due process cause of action where plaintiff alleged his resignation "was a 'constructive discharge' that deprived him of this property interest without due process of law"); *Voss v. Hous. Auth. of City of Magnolia*, 1:15-cv-1001-SOH, 2016 WL 1178788, at *2 (W.D. Ark. Mar. 23, 2016) (discussing plaintiff's claim where he alleged that his "'wrongful constructive termination'" violated his due process rights).  Nor did Plaintiff take that position in his Motion for Temporary Restraining Order.  *See generally* Doc. [3].

Court that suggests the hearing occurred—let alone that the hearing occurred *and* also failed to provide Plaintiff the process he is due.  Indeed, the only update on the status of the hearing the Court has seen is Defendants' representation that, by agreement with Plaintiff, "the hearing before the Board of Governors was not conducted."  Doc. [12] at 14.  This facet of his claim is not ripe; therefore, the Court will dismiss it without prejudice.  *See Mo. Soybean Ass'n v. U.S. E.P.A.*, 289 F.3d 509, 513 (8th Cir. 2002).

But there is more to this Count.  It also alleges certain "policies and procedures" in the faculty handbook regarding tenure and prohibited conduct are "unconstitutionally vague," Doc. [1] ¶ 199, and the "standards upon which [Plaintiff] is being evaluated are unconstitutionally vague," *id.* ¶ 200.  Plaintiff alleges that the vagueness of the policies and procedures make this claim ripe since the vagueness chills him from engaging in protected speech. *Id.* ¶ 201; *see also* Doc. [16] at 18.  In some circumstances, federal courts will perform pre-enforcement reviews of a vague law if the litigant is chilled from engaging in constitutionally protected activity.  *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011).  These challenges, however, usually involve criminal statutes, regulations, and ordinances as opposed to mere employment policies.  *See id.* (explaining "pre-enforcement review provides law-abiding citizens with a middle road between *facing prosecution* and refraining from otherwise constitutional conduct" (emphasis added)); *see also, e.g.*, *Copeland v. Vance*, 893 F.3d 101, 111 (2d Cir. 2018) (pre-enforcement claim challenging state law criminalizing possession of "gravity knives"); *but see Guadalupe Police Officer's Ass'n v. City of Guadalupe*, 2:10-cv-8061-GAF, 2011 WL 13217672, at *6 (C.D. Cal. June 8, 2011) (pre-enforcement claim challenging constitutionality of police department's policy governing employees' speech, expression, and social networking usage).

17

As pleaded, this facet of Plaintiff's due process claim fails. A policy is so vague as to violate due process when it either (1) fails to inform ordinary people what conduct is prohibited, or (2) allows for arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The provisions Plaintiff cites are sufficient to inform ordinary people—even more so, ordinary tenured professors—what conduct is prohibited. Doc. [1] ¶¶ 193–195; *see also Arnett v. Kennedy*, 416 U.S. 134, 158–59 (1974) (upholding general standard of "such cause as will promote the efficiency of the service" for dismissal of civil service employees); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1126–27, 1138 (3d Cir. 1992) (rejecting tenured professor's claim that university's dismissal regulations that allowed for dismissal for "incompetence" or "failure to maintain standards of sound scholarship" were void for vagueness). In addition, Plaintiff alleges he received multiple communications from University authorities about his conduct. *See, e.g.*, Docs. [1-15], [1-16]. So, even if the University's policies and procedures bordered on vague, he was clearly on notice that the policy applied to his conduct because the University continued to tell him that it did. *See Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) (concluding that because university administrators told professor that policy in question applied to his conduct, professor "was on notice that the policy prohibited his conduct" and therefore could not challenge the policy for vagueness). Therefore, the Court will dismiss this facet of Plaintiff's claim in Count Four with prejudice.

**D. Violation of Missouri Administrative Law – Arbitrary and Capricious Decision Making; Article II, § 1 of the Missouri Constitution; And, Federal Procedural Due Process Rights**

In Count Five, Plaintiff served "a legal bouillabaisse" with strong flavors of Missouri administrative law, a touch of Missouri constitutional law, and which supposedly contains some law on federal procedural due process rights. *See U.S. Gen., Inc. v. City of Joliet*, 598 F.2d 1050,

1051–52 (7th Cir. 1979). Even giving Plaintiff every reasonable reading and inference, the Court simply cannot discern a statement of a federal claim within Count Five showing that Plaintiff is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998) ("[I]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated."). Therefore, the Court will dismiss any federal claim, to the extent there even is one, in Count Five. *See, e.g.*, *Cheeks v. Belmar*, 4:18-cv-2091-SEP, 2020 WL 5569982, at *2 n.3, *30 (E.D. Mo. Sept. 17, 2020) (dismissing, on the court's own motion, plaintiff's count that included "multiple causes of action based on four constitutional provisions in a single count without adequately identifying the nature and constitutional basis of each cause of action").

### E. State Law Claims in the Remainder of Count Five and in Count Six

Since the Court has determined that Defendants are entitled to dismiss Plaintiff's federal law claims, it now determines whether to retain or to decline jurisdiction over the remaining claims in this case, which arise under Missouri state law. Plaintiff's state law claims are before the Court based on supplemental jurisdiction under 28 U.S.C. § 1367, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." § 1367(a). When supplemental jurisdiction over a claim exists under § 1367(a), a district court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction. § 1367(c).

A district court's decision to exercise supplemental jurisdiction in such circumstances is "purely discretionary." *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 639 (2009). "[I]n

the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *accord Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009).

Finding no factor that distinguishes this case from the usual case in which all federal claims are eliminated before trial, the Court declines to exercise supplemental jurisdiction over the remaining claims in this case under § 1367(c)(3) and will dismiss Count Six and all state law claims contained in Count Five without prejudice.

**C**ONCLUSION

For the reasons explained herein, the Court will grant Defendants' Motion to Dismiss in part and deny it without prejudice in part. Plaintiff's claims arising under Federal law will be dismissed. Defendants' Motion to Dismiss will be denied without prejudice as to Plaintiff's claims under Missouri law—Count Six and all state law claims contained in Count Five—and the Court will dismiss those state law claims without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, Doc. [11], is **GRANTED** in part and **DENIED** without prejudice in part. The Motion is granted as to Plaintiff's claims arising under the First Amendment, Count One through Count Three, and these claims are **DISMISSED** with prejudice. The Motion is granted as to Plaintiff's claim for "Violation of [his] Right to Due Process of Law," Count Four, and that claim is **DISMISSED** with prejudice in part, as to the vagueness aspect of the claim, and without prejudice in all other respects. The Motion is

granted in part as to Count Five, and any construable federal claim within Count Five is **DISMISSED** with prejudice.  The Motion is denied without prejudice in all other respects.

**IT IS FURTHER ORDERED** that supplemental jurisdiction under 28 U.S.C. § 1367 is declined over Plaintiff's remaining state law claims, Count Six and what remains of Count Five, and these state law claims are **DISMISSED** without prejudice.

Dated this 22nd day of December 2022.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE